NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 12, 2026

S25G0476. CITY OF MILTON v. CHANG, et al.

PINSON, Justice.

We granted review of this case to address how to apply certain statutes having to do with municipal liability when someone sues a city for negligence that causes injuries on city streets. One of those statutes, OCGA § 36-33-1(b), waives the immunity of municipalities for negligence in performing "ministerial duties." The other one, OCGA § 32-4-93(a), limits municipal liability for negligence claims against a municipality for "defects in the public roads." For the reasons set out below, we conclude as follows. First, OCGA § 32-4-93(a) itself does not waive municipal immunity for "road-defect" negligence claims against a municipality, so any such waiver must come from another source. Second, that kind of claim may rely on OCGA § 36-33-1(b)'s immunity waiver if a municipality's ministerial

duty to keep its streets and sidewalks safe for travel is implicated by the specific claim at issue. And third, based on our precedent, that ministerial duty is limited to keeping streets and sidewalks safe for ordinary travel on the parts of the street or sidewalk intended for such travel — that is, in the lanes of travel. This duty does not extend to keeping property outside the lanes of travel safe for traversal in case of an accident or emergency. That does not mean that a city has no duty of care or liability in connection with its property under such circumstances — only that any waiver of municipal immunity for a negligence claim involving those circumstances must come from some other source. The judgment of the Court of Appeals is vacated and remanded for proceedings consistent with this opinion.

1. *Background*

One night in November 2016, college student Joshua Chang was driving to his parents' home. As he was traveling along Batesville Road in the City of Milton, he turned his wheel hard, and his car left the paved road, slid more than 60 feet, flipped, and

landed on a substantial concrete "planter" that was sitting in between two driveways, more than six feet off the road. Chang died from his injuries.

Chang's parents sued the City of Milton, claiming that the City was negligent in failing to remove the planter, an alleged "defect" in the public roads, and that the planter was a nuisance for which the City was liable. After a trial, the jury found the City liable under both theories and awarded damages of $35 million, reduced by seven percent to reflect Chang's comparative fault.

The City appealed, arguing that the plaintiffs' claims were barred by sovereign immunity (either wholly, or at least beyond the City's $2 million insurance policy limit) and that they had not presented sufficient evidence to support their nuisance claim. The Court of Appeals affirmed. *City of Milton v. Chang*, 373 Ga. App. 667 (2024). As to sovereign immunity, the court explained that cities are protected by sovereign immunity unless that immunity is waived by the legislature or the Constitution, and under OCGA § 36-33-1(b), this immunity is waived if a city is negligent in performing a

ministerial duty. Id. at 670–71. Noting that cities have a ministerial duty to "maintain city streets in a reasonably safe condition for travel," the court went on to assess whether sovereign immunity was waived by applying a different statute, OCGA § 32-4-93(a), which says that "[a] municipality is relieved of any and all liability resulting from or occasioned by defects in the public roads of its municipal street system" so long as the municipality "has not been negligent in constructing or maintaining the same or when it has no actual notice thereof or when such defect has not existed for a sufficient length of time for notice thereof to be inferred." Id. at 671. The court reasoned that the concrete planter that Chang crashed into was "in the public road" because it was "on the shoulder, in the right-of-way on a City-owned road." Id. at 671–72 (citing OCGA § 32-4-93(a)). And based on the evidence presented, "it was for the jury to determine if the planter constituted a defect." Id. at 673. Finally, the court concluded that there was sufficient evidence from which the jury could conclude that the City had notice of the planter. Id. at 675. In the court's view, all of that meant that sovereign immunity

was waived under OCGA § 36-33-1. And given that conclusion, there was no need to address the separate waiver of sovereign immunity up to the limits of the City's insurance policy, or the City's argument that the plaintiffs failed to establish a nuisance.

This Court granted review to consider the interplay between OCGA § 36-33-1 and OCGA § 32-4-93(a), as well as the scope of a municipality's long-established ministerial duty to keep its streets and sidewalks safe for travel.

## 2. *Legal Framework*

The Georgia Constitution declares that "[t]he General Assembly may waive the immunity of counties, municipalities, and school districts by law." Ga. Const. of 1983, Art. IX, Sec. II, Par. IX. This provision does not confer immunity on these entities, but instead "preserve[s] whatever sovereign immunity existed for [municipalities] at common law and make[s] clear that the General Assembly may waive it." *Guy v. Hous. Auth. of City of Augusta*, 321 Ga. 873, 876 (2025).

In turn, the General Assembly has provided limited waivers of

5

this municipal immunity. Relevant here, the legislature has "declare[d]" in OCGA § 36-33-1(a) that "it is the public policy of the State of Georgia that there is no waiver of" this immunity and that "such municipal corporations shall be immune from liability for damages." This statute goes on, however, to identify certain exceptions where municipal immunity has been waived. Subsection (a) of the statute explains that a municipal corporation waives this immunity if it buys liability insurance and that policy "covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy."[1] And subsection (b) says that municipal corporations are not liable for "failure to perform or for errors in performing their legislative or judicial powers," but that they "shall be liable" for "neglect to perform or improper or unskillful performance of their ministerial duties." This latter provision codifies "the common-law doctrine, frequently applied in this state before and since adoption of the Code

---

[1] This subsection also identifies waivers of immunity with respect to motor vehicles of local governments by reference to OCGA §§ 33-24-51 and 36-92-2. Those waivers are not relevant here.

[of 1895], of nonliability for conduct of officers, agents, and servants of municipal corporations in respect to duties devolving upon them in virtue of the sovereign or governmental functions of the municipality." *Cornelisen v. City of Atlanta*, 146 Ga. 416, 417 (1917). See also Ga. Code of 1895 § 748 (citing *Collins v. Mayor of Macon*, 69 Ga. 542 (1882)); *Gatto v. City of Statesboro*, 312 Ga. 164, 166 (2021). Further, we have said that this provision's declaration that municipal corporations "shall be liable" for the negligent performance of their ministerial duties waives municipal immunity for a claim that a municipality negligently performed a ministerial duty. See *City of Atlanta v. Mitcham*, 296 Ga. 576, 577–78 (2015). And for more than a century, we have treated as one such ministerial duty the duty at issue in this case: that is, the duty to keep city streets and sidewalks safe for travel. See, e.g., *Mayor & Council of Dalton v. Wilson*, 118 Ga. 100, 104 (1903) (relying on the "well-established rule in this State that a municipal corporation is bound to keep its streets and sidewalks in a reasonably safe condition, and that the failure to perform this duty constitutes a

breach of a ministerial duty").

Under a separate title of our Code, OCGA § 32-4-93(a) limits the liability of municipalities with respect to "defects in the public roads of its municipal street system."[2] In contrast to OCGA § 36-33-1(b), this statute does not create any waiver of municipal immunity. To begin with, the language of this provision looks nothing like the express language of OCGA § 36-33-1 that subjects municipalities to liability in specific instances. See also Ga. Const. of 1983, Art. IX, Sec. II, Par. IX; *CSX Transp., Inc. v. City of Garden City*, 277 Ga. 248, 249 (2003) ("[O]nly the legislature has the authority to enact a law that specifically waives a municipality's sovereign immunity."). Instead, OCGA § 32-4-93(a) speaks only of limiting municipal liability, not imposing it: the statute says that a municipality is "relieved of any and all liability resulting from or occasioned by

---

[2] Code section 32-4-93(a) reads in full:

A municipality is relieved of any and all liability resulting from or occasioned by defects in the public roads of its municipal street system when it has not been negligent in constructing or maintaining the same or when it has no actual notice thereof or when such defect has not existed for a sufficient length of time for notice thereof to be inferred.

defects in the public roads of its municipal street system" when it either has not been "negligent in constructing or maintaining" said roads, or when it lacks sufficient notice, either actual or constructive. OCGA § 32-4-93(a).

Moreover, although this language leaves a distinct impression of a specific kind of negligence claim that may be brought against a municipality (because a municipality is not "relieved" of liability if it *has* been negligent and *had* the required notice), the statutory history makes clear that the provision merely identifies limits on such a claim rather than waiving immunity for it. The language of the current statute's predecessor, found in the Code of 1895, came from one of our early decisions holding that a city was not negligent as a matter of law under the circumstances of that case — that is, a decision addressing the elements of the substantive claim of liability, not a threshold question of "waiver" or "nonliability." See Ga. Code of 1895 § 749 (citing *Mayor of Montezuma v. Wilson*, 82 Ga. 206, 208–09 (1888) (reversing as contrary to the evidence verdict for plaintiff on negligence claim for injuries from falling through a

9

sidewalk bridge into a ditch because the city had no notice of the defect that caused the injury)). Compare *Cornelisen*, 146 Ga. at 417; *Collins*, 69 Ga. at 546–48. That provision has since been amended and moved to a new title, but nothing about those changes suggests that the provision has transformed into a waiver of immunity. Compare Ga. Code of 1895 § 749 ("If a municipal corporation has not been negligent in constructing or repairing the same, it is not liable for injuries resulting from defects in its streets when it has no notice thereof, unless such defect has existed for a sufficient length of time for notice to be inferred.") with OCGA § 32-4-93(a) ("A municipality is relieved of any and all liability resulting from or occasioned by defects in the public roads of its municipal street system when it has not been negligent in constructing or maintaining the same or when it has no actual notice thereof or when such defect has not existed for a sufficient length of time for notice thereof to be inferred."). And indeed, despite the long history of this provision and the negligence claim it limits, none of this Court's decisions has ever treated this provision or its predecessors as a waiver of municipal immunity. We

10

see no basis for doing so now.

Having concluded that OCGA § 32-4-93 does not waive municipal immunity, we can say the following about the relationship between that statute and OCGA § 36-33-1(b). Code section 36-33-1(b) waives municipal immunity with respect to ministerial duties, including the long-established duty to keep city streets and sidewalks safe for travel. (More on the scope of that duty, the other question in this case, in a bit.) Code section 32-4-93(a), on the other hand, codifies limits on a specific kind of "road defect" negligence claim against municipalities. But, as we have just confirmed, this statute does not also waive municipal immunity for such claims. So, to determine whether municipal immunity is waived for a given road-defect claim, we do not look to OCGA § 32-4-93(a), but to statutes that could provide such a waiver, including OCGA § 36-33-1(b).

This is where the Court of Appeals departed from the proper analysis. The court started in the right place, with the threshold question whether the City's immunity was waived for the plaintiffs'

road-defect claim. *Chang*, 373 Ga. App. at 671. See *Starship Enter. of Atlanta v. Gwinnett County*, 319 Ga. 293, 297 (2024) ("Sovereign immunity … is a threshold jurisdictional issue."). But rather than asking whether OCGA § 36-33-1(b) (or another statute that speaks to municipal immunity) supplied such a waiver, the court skipped to OCGA § 32-4-93(a) and asked only whether the trial evidence supported findings that the planter was a "defect" in the road of which the City had sufficient notice. And then, concluding that the evidence supported those findings, it held that the City's immunity was waived. *Chang*, 373 Ga. App. at 670–71. In other words, the court conflated the threshold waiver inquiry with an analysis of whether sufficient evidence established the substantive elements of the plaintiffs' road-defect claim. In doing so, the court skipped the proper threshold immunity inquiry. That inquiry, at least when a plaintiff with a road-defect negligence claim relies on OCGA § 36-33-1(b) as a waiver of municipal immunity, asks whether the negligent conduct for which the plaintiff seeks to hold the municipality liable involves the negligent performance of the

municipality's ministerial duties. See OCGA § 36-33-1(b); *Gatto*, 312 Ga. at 167; *City of Savannah v. Jones*, 149 Ga. 139, 141–42 (1919). And that inquiry is not answered by determining whether the substantive elements of a road-defect claim are satisfied. The Court of Appeals erred in holding otherwise.

Putting all of this together: When a plaintiff seeks to hold a municipality liable for negligence for injuries caused by a defect in public roads, one threshold question is whether municipal immunity bars the suit. See *Starship Enter. of Atlanta*, 319 Ga. at 297. If the plaintiff asserts that OCGA § 36-33-1(b) waives municipal immunity for that claim, the proper inquiry asks whether the negligent conduct for which the plaintiff seeks to hold the municipality liable involves the performance of the municipality's ministerial duties. If so, the claim may proceed. If not, the plaintiff must find another way past municipal immunity, if one exists.[3]

---

[3] One such way, of course, is the preceding subsection of OCGA § 36-33-1, which waives municipal immunity up to the limits of a municipality's insurance policy that "covers an occurrence for which the defense of sovereign immunity is available." Id. § 36-33-1(a).

3. *Municipal Immunity*

Having clarified the roles of OCGA § 36-33-1(b) and OCGA § 32-4-93(a), we can now address the threshold question whether OCGA § 36-33-1(b)'s waiver of municipal immunity covers the plaintiffs' negligence claim here. The plaintiffs contend that this waiver applies to that claim because we have long treated the general duty to keep city streets and sidewalks safe for travel as a ministerial duty, and negligently failing to remove the planter from its location off the side of the road where Chang crashed breached that duty. To resolve that argument, we must determine the scope of this ministerial duty.

(a) To address the scope of the ministerial duty at issue, it is important to understand that duty's fit within the relevant legal landscape.

Start with the line that we have said OCGA § 36-33-1(b) draws between governmental functions (to which municipal immunity applies) and ministerial duties (for which municipalities are subject

to liability). See *Gatto*, 312 Ga. at 166; *Mitcham*, 296 Ga. at 577–78.[4]

That line is supposed to reflect a municipal corporation's "dual character, the one public and the other private." *Mitcham*, 296 Ga. at 579 (quoting *Wilson*, 118 Ga. at 102).[5] Speaking generally, a municipal corporation exercises a "governmental function" when it acts in its public character "as an agency of the State to enable it the better to govern that portion of its people residing within the municipality" and exercises its powers "for public governmental

---

[4] Although the statute recognizes municipal immunity for "errors in performing their legislative or judicial powers," we have long described this side of the line as "governmental functions" in addressing whether a particular municipal function is entitled to immunity under this statute, see, e.g., *Gatto*, 312 Ga. at 167, and that language has remained the same through each of our codes over time, from the Code of 1895 up through and including the current one. See Ga. Code of 1895 § 748 ("Municipal corporations are not liable for failure to perform, or for errors in performing, their legislative or judicial powers. For neglect to perform, or for improper or unskillful performance of their ministerial duties, they are liable."); Ga. Code of 1910 § 897 (same); Ga. Code of 1933 § 69-301 ("Municipal corporations shall not be liable for failure to perform, or for errors in performing, their legislative or judicial powers. For neglect to perform, or for improper or unskillful performance of their ministerial duties, they shall be liable."); Ga. L. 1986 p. 1312 § 1 (enacting OCGA § 36-33-1(b) in its current form, which is the same as in the Code of 1933 but without the first three commas).

[5] The question whether a municipality's function is ministerial or governmental for purposes of applying OCGA § 36-33-1(b) is not the same as the similar-sounding "discretionary or ministerial" distinction that matters in the context of official immunity. See *Mitcham*, 296 Ga. at 581–82.

purposes." Id. (quoting *Wilson*, 118 Ga. at 102). And a municipal corporation exercises a "ministerial" function when it acts "[i]n its corporate and private character" and exercises some "franchise," "privilege[ ]," or "power[ ]" "for its own private advantage" rather than for a public purpose. Id. at 578–79 (quoting *Wilson*, 118 Ga. at 102).

For the most part, our courts have placed various municipal functions in these categories according to this public/private distinction. Into the category of governmental functions, our courts have placed functions of a "purely public nature, intended for the benefit of the public at large, without pretense of private gain to the municipality." Id. at 578. Those functions have included, for example, maintaining and operating a traffic light system, *Town of Fort Oglethorpe v. Phillips*, 224 Ga. 834, 835–36 (1968); operating a jail, *Mitcham*, 296 Ga. at 580 (citing *Hurley v. City of Atlanta*, 208 Ga. 457, 457–459 (1951)); operating a fire department, *Miller v. City of Macon*, 152 Ga. 648, 648 (1922); keeping a sewerage drainage system in sanitary condition, *City Council of Augusta v. Cleveland*,

16

148 Ga. 734, 735 (1919); sanitation related to public health, *City of Savannah v. Jordan*, 142 Ga. 409, 413 (1914); and maintaining public parks and recreational facilities, *Cornelisen*, 146 Ga. at 419–20. Into the ministerial-duty category, on the other hand, our courts have placed functions "involving the exercise of some private franchise, or some franchise conferred upon the municipal corporation by law which it may exercise for the private profit or convenience of the corporation or for the convenience of its citizens alone, in which the general public has no interest." *Mitcham*, 296 Ga. at 578 (quotation marks omitted). Those functions have included things like operating a city-owned rock quarry, *City Council of Augusta v. Owens*, 111 Ga. 464, 477 (1900), and operating a for-profit toll bridge, *City Council of Augusta v. Hudson*, 94 Ga. 135, 136–38 (1894). See also *Cornelisen*, 146 Ga. at 418–19 (citing *Savannah v. Cullens*, 38 Ga. 334 (1868), *City of Augusta v. Mackey*, 113 Ga. 64 (1901), *Sedlmeyr v. Fitzgerald*, 140 Ga. 614 (1913)) (categorizing the operation of a city-owned market, waterworks, and electric-light plant as ministerial functions).

We say that these decisions have hewed to the public/private distinction "for the most part" because the duty at issue in this case — roughly put, keeping city streets and sidewalks safe for travel — appears to be an obvious outlier. We have long treated that duty as ministerial. See, e.g., *Love v. City of Atlanta*, 95 Ga. 129, 132 (1894). But that label is pretty hard to justify under the longstanding test as we have stated and applied it. Keeping public, city-owned streets and sidewalks safe for the public to travel on plainly benefits the public at large, including members of the public who do not live in the city. To perform that function, a municipality exercises governmental powers granted by the General Assembly, not any kind of private "franchise." See *Mitcham*, 296 Ga. at 578 (quotation marks omitted). And this is certainly not the kind of function, like running a for-profit toll bridge or rock quarry, intended to secure a "private profit" or a municipality's "own private advantage." Id. (quotation marks omitted). Indeed, for these reasons, we have noted on more than one occasion the "incongru[ity]" of classifying this duty as ministerial rather than governmental. *Gatto*, 312 Ga. at 168 n.4.

18

See also *Love*, 95 Ga. at 132 (duty to keep public streets in repair "might properly have been originally classified among the cases of nonliability" because "[t]he duty of keeping its streets in repair is a public duty in which the general public is interested," "[t]he State commits to it the discharge of those governmental duties incident to the sovereign power, by which it is required to maintain for the use of the general public and for the public convenience a system of roads throughout the State," and "the assignment of this particular duty to municipal corporations within their limits may fairly be said to be a delegation of what appears to us to be one of the functions of the government").

This is not to say that the classification of this duty as ministerial must be reconsidered. (No party has asked us to do so, and anyway, stare decisis would be a substantial impediment.) But the "incongruity" of classifying this would-be governmental function as ministerial necessarily affects how we go about determining the scope of this duty. See *Gatto*, 312 Ga. at 167 n.4. As we have just explained, the assessment of whether a particular function is

19

governmental or ministerial ordinarily focuses on the "nature, purpose, and intended beneficiaries of the function performed by the municipal corporation," that is, the "public or private" question. *Mitcham*, 296 Ga. at 582. Yet asking that question will not help us figure out the boundaries of the duty here because only our precedent, not the true nature of the duty, has put this duty into the ministerial category. So our determination of the scope of this duty is necessarily limited to that precedent. In other words, rather than applying the ordinary "governmental or ministerial" test to the conduct at issue here, we have nothing else to do but review the precedent addressing this particular duty and ask whether this conduct and claim fits within the bounds of the ministerial duty outlined by that precedent.

(b) So we turn to that precedent now, keeping in mind the precise question of scope this case presents: to what extent, if at all, does a city's ministerial duty to keep its streets and sidewalks safe for travel extend to addressing potential hazards or obstructions which — like the planter in this case — are not located *in* the

20

relevant street or sidewalk? Sifting through this body of precedent, the relevant contours of the duty become apparent. As relevant to the question of scope before us, these decisions focus on keeping streets and sidewalks safe for ordinary travel on the parts of the street or sidewalk intended for such travel — that is, in the lanes of travel.

This understanding comes first from how this duty is described in our various decisions. In *City of Atlanta v. Hampton*, for example, we explained that "[i]t is very common, in stating the rule, to say that it is the duty of a municipal corporation to keep its streets and sidewalks in a reasonably safe condition, so that persons can pass along them in the ordinary methods of travel in safety." 139 Ga. 389, 392 (1913). And as to sidewalks, we clarified further that the "duty of a city to keep a sidewalk reasonably safe for public use" is "not confined to keeping in a safe condition a special part only of a sidewalk which happens to be most generally used" but "extends to all of the sidewalk intended for *travel by the public as a thoroughfare*." Id. (citing *City of Atlanta v. Milam*, 95 Ga. 135 (1894)

21

(syllabus by the Court); *City Council of Augusta v. Tharpe*, 113 Ga. 153, 156 (1901)) (emphasis added).[6] Although the language varies slightly from decision to decision, the focus on keeping the travel lanes of the streets and sidewalks safe for ordinary travel remains constant. For example, in *Idlett v. City of Atlanta*, we described it as "the duty of a city to keep its streets and sidewalks in a reasonably safe condition, so that persons can pass along them in the ordinary method of travel in safety." 123 Ga. 821, 823 (1905). In *City Council of Augusta v. Tharpe*, we held that a challenged jury charge contained a "correct proposition of law" when it instructed that "[t]he duty of the city is to keep a sidewalk reasonably safe for public use" and "[t]hat extends to all of the sidewalk *intended for travel by the public as a thoroughfare*, and is not confined to keeping in a safe condition a separate part only of the sidewalk which happens to be most generally used." 113 Ga. at 155 (emphasis added). In *City of*

---

[6] Although the case before us has to do with a city street, not a sidewalk, the ministerial duty we seek to understand is often stated as to both and applies to both, and the principles gleaned from the "sidewalk cases" — which, given the age of most the precedent, are more numerous — are helpful to understanding the principles as to city streets.

*Atlanta v. Perdue*, we said "[t]he general rule of law is, that a municipal corporation is bound to keep its streets and sidewalks in a safe condition for *travel in the ordinary modes*, by night, as well as by day." 53 Ga. 607, 608 (1875) (emphasis added) And so on. See *Milam*, 95 Ga. at 137 ("[T]here can be no doubt, under the rules of law now settled by repeated adjudications in this and other jurisdictions, that the city authorities must keep in a reasonably safe condition all parts of its sidewalks which are intended to be used by the public."); *Bellamy v. City of Atlanta*, 75 Ga. 167, 169 (1885) ("It is the duty of the city to keep its streets and sidewalks in a reasonably safe condition, so that persons can *pass thereon* in safety by day or night." (emphasis added)); *City of Milledgeville v. Cooley*, 55 Ga. 17, 18 (1875) ("It is a general rule of law that a municipal corporation is bound to keep its streets and sidewalks in a safe condition for travel, in the ordinary modes, by night as well as by day."). Taken together, these decisions describe a duty to keep streets and sidewalks reasonably safe for ordinary travel on the parts of the street or sidewalk intended for such travel.

23

This articulation of the duty finds further support in the factual context of these decisions. Our decisions squarely addressing this duty involved plaintiffs injured during ordinary travel on a part of the street or sidewalk intended for such travel. Pedestrians who stepped on a broken water-meter cap, *Hampton* 139 Ga. at 390; fell in a hole, *Idlett* 125 Ga. at 824–25, *Bellamy*, 75 Ga. at 168; ran into barbed wire stretched along a sidewalk when crossing the street, *Tharpe*, 113 Ga. at 155; fell "violently" over an "iron projection" that projected four feet onto the sidewalk, *Milam*, 95 Ga. at 43 (syllabus by the Court); fell into an open cellar, *City of Augusta v. Hafers*, 61 Ga. 48, 50 (1878); fell into a "gully," *Cooley*, 55 Ga. at 18; and fell into an "excavation," *Perdue*, 53 Ga. at 607–08, were all traveling on the sidewalk or in a public street in the ordinary course when they encountered the obstruction or hazard that caused their injuries.

There is an important qualifier. The ministerial duty to keep city streets and sidewalks safe for travel does not stop short of imposing liability merely because the obstruction or hazard itself is located or extends beyond the travel lanes. We know this from

24

decisions like *Tharpe*, a case involving a plaintiff who crossed a city street and ran into a stretch of sharp wire running "along the edge of the sidewalk." 113 Ga. at 153. The city challenged an instruction to the jury that "it was incumbent on the city to keep that portion of the sidewalk immediately along the curbing, whether used longitudinally or laterally, reasonably safe for public use." Id. at 155. We rejected the challenge, explaining that the duty "extends to all of the sidewalk intended for travel by the public as a thoroughfare," and citing treatises for the rule that a municipality was liable for obstructions that "adjoin the traveled way which will render its use unsafe and dangerous." Id. at 155–56 (citing Dwight Arven Jones, A Treatise on the Negligence of Municipal Corporations § 77 at 144, § 78 at 147 (1892)). Cf. *Parker v. Mayor & Council of Macon*, 39 Ga. 725, 729 (1869) (in a nuisance case, explaining that the "duty ... to keep the streets, lanes, alleys and sidewalks in such condition that persons passing over or along them may do so with safety and convenience" included protecting pedestrians from a crumbling wall on the edge of a street that could fall on a person passing it on the

25

street).

That said, *Tharpe* does not, as the plaintiffs and the dissent contend, extend this ministerial duty to keeping property *outside* lanes of travel safe for traversal in case of an accident or emergency. The plaintiff in *Tharpe* was crossing from a public street onto a public sidewalk that was "part of a public street" when he ran into the wire. *Tharpe*, 113 Ga. at 153–54, 156. Although the particular place the plaintiff crossed the public street was not a "regular street crossing" (which we take to mean a dedicated crosswalk of some kind), we noted that it was still a part of the street he had a legal "right" to cross, and one where another child had been injured before. See *Tharpe*, 113 Ga. at 153–54, 158. And crossing the street to get to a sidewalk on the other side is ordinary travel.[7] So by

---

[7] As our decisions show, "ordinary" travel may look different for sidewalks and streets; the ministerial duty is to keep sidewalks safe for travel in the ways that people typically travel on sidewalks (e.g., walking), and city streets safe for travel in the ways the people typically travel on streets (e.g., driving a vehicle). See, e.g., *Hampton*, 139 Ga. at 391 ("The rule of duty incumbent upon a municipality as to both streets used by vehicles and sidewalks used by pedestrians is to use ordinary care to keep them in a reasonably safe condition for travel in the ordinary modes, both by day and by night."). Moreover, what "ordinary travel" looks like in each context may

crossing the street where he did on his way to the public sidewalk, the plaintiff in *Tharpe* was engaging in ordinary travel on parts of the street and sidewalk intended for such travel by a pedestrian — not traversing property outside those lanes of travel because of an accident or emergency.[8] In short, the only rule we can reasonably

---

change with the times. For instance, although we might say as a general matter today that people ordinarily walk on sidewalks and drive vehicles on streets, our older decisions commonly noted how typical it was for pedestrians to use streets too, especially for crossing (and not just using marked crosswalks). See, e.g., *Tharpe*, 113 Ga. at 158 (rejecting jury instruction requested by the city seeking to limit its duty with regard to pedestrians crossing "from the street to the sidewalk or the reverse" because "[t]he traveler has the right to use the street by passing across it at a point where there is no crosswalk," and does not "assume any greater risks" from "unauthorized obstructions" in doing so); *Cooley*, 55 Ga. at 18–19 (affirming verdict for plaintiff finding city negligent in case where pedestrian was "walking along [a] street in the night time" and fell "into a deep ditch or gully across … the public street[ ]" and broke his arm).

[8] The dissent is thus mistaken when it characterizes *Tharpe* as a case about "injuries sustained outside the lane of travel," or the wire in *Tharpe* as dangerous only to someone who "left the lane of travel and 'attempted to cross the street' outside the crosswalk designated for that purpose." As we made clear in *Tharpe*, at the time that case was decided more than a century ago, a pedestrian could legally cross the relevant Augusta street outside of a "regular street crossing," see *Tharpe*, 113 Ga. at 154, 158 ("The traveler has the right to use the street by passing across it at a point where there is no crosswalk."), and nothing in our precedent suggests that crossing a street to get to a sidewalk on the other side would have been understood as anything other than ordinary travel. So the plaintiff was not "le[aving] the lane of travel" and then encountering the dangerous wire, as the dissent would have it; he was engaging in ordinary travel within a part of the street system intended for such travel.

27

draw from *Tharpe* is that a municipality's ministerial duty to keep its streets or sidewalks safe for travel includes keeping people engaging in ordinary travel on the parts of the street or sidewalk intended for such travel safe from adjacent obstructions.[9]

The plaintiffs and the dissent contend that *Wilson v. City of Atlanta*, 60 Ga. 473, 477 (1878), supplies the necessary precedent in support of their view. Wilson was injured when his horses spooked and pulled his buggy off the side of an embankment that was built

---

[9] The dissent claims that *Tharpe* "held" that the ministerial duty at issue here "extends to all parts of the municipal street and sidewalk system on which members of the public have the right to travel." But *Tharpe* did not say that, and that characterization of the duty misconceives that duty's nature and limits. *Tharpe* upheld an instruction that charged the jury that the duty "extends to all of the sidewalk *intended for travel by the public as a thoroughfare*, and is not confined to keeping in a safe condition a separate part only of the sidewalk which happens to be most generally used." *Tharpe*, 113 Ga. at 156 (emphasis added and quotation marks omitted). This instruction reflects the key focus that our body of precedent identifies for the duty: to keep city streets and sidewalks safe for *ordinary travel*. See, e.g., *Hampton*, 139 Ga. at 392; *Idlett*, 123 Ga. at 823; *Perdue*, 53 Ga. at 608; *Cooley*, 55 Ga. at 18. If a part of the sidewalk is used by pedestrians to get from one place to another — as a "thoroughfare," as the instruction in *Tharpe* puts it — that part of the sidewalk must be kept reasonably safe for such ordinary travel to comply with the ministerial duty. And if the public has a "right" to use the whole of a sidewalk in that way, the duty protects ordinary travel over the whole of the sidewalk. But the duty is to keep the sidewalk safe *for ordinary travel*, not for any and all purposes. To the extent that the dissent reads *Tharpe* or our precedent to say otherwise, it is mistaken.

up in the middle of the city street. Wilson sued the city for negligence, and after a trial, the jury found in Wilson's favor, but the trial court granted a new trial on the ground that the verdict was "strongly and decidedly against the weight of the evidence." Id. at 473. In reviewing that decision, which we affirmed, we stated that "[t]he street should be reasonably safe for ordinary travel, including such accidents as might, without fault on the part of the traveler, befall him." Id. at 477. Seizing on this broad statement, the plaintiffs reason that accidents may require a traveler to leave the lane of travel, so the ministerial duty to keep city streets safe for travel must extend to keeping property *outside* the lanes of travel safe for traversal in case of accidents and emergencies.

That conclusion may well be reasonable as a matter of policy, but again, the scope of this particular ministerial duty is constrained by our precedent. And *Wilson*'s statement about accidents (for which we cited nothing) is not binding precedent expanding the scope of the ministerial duty here. It is "axiomatic" that a holding is "limited to the factual context of the case being decided and the issues that

context necessarily raises," *Schoicket v. State*, 312 Ga. 825, 832 (2021), and in *Wilson*, we made that statement about accidents in the context of disapproving a ruling about causation, not determining the proper scope of a municipality's ministerial duty. That ruling, one of the trial court's stated bases for granting the new trial, was that "no matter what was the negligence of defendant in respect to the streets," a plaintiff "cannot recover damages" as a general matter "where a swingle-tree becomes detached, and horses are frightened and run away, and run over an embankment."[10] *Wilson*, 60 Ga. at 477. In rejecting this ruling as "too broad," we described a hypothetical embankment that was narrower and taller and explained that "there could be a recovery, notwithstanding the running away of the horses," if "the faulty plan or structure of the grading was the real cause of the damage." Id. at 477 (emphasis added). In other words, spooked horses and a broken swingle-tree

---

[10] A "swingle-tree," also known as a "single-tree," "whiffle-tree" or "whipple-tree," is a cross-piece used to connect a team of horses to a vehicle or implement. See *Swingle-tree*, Chamber's Twentieth Century Dictionary (1903); *Single-tree*, Noah Webster, An American Dictionary of English Language (1897).

did not as a matter of law cut off the city's negligence as a potential cause of the resulting injuries. That is a holding addressing causation, not the proper scope of a city's ministerial duty (a term our opinion does not mention even once). Thus, that decision cannot be reasonably understood as binding precedent that expands the scope of the ministerial duty at issue here.

And even if *Wilson* could be so understood, it still does not support plaintiffs' expanded view of that duty, because Wilson did not advance the plaintiffs' theory of liability in that case. Wilson was riding in a horse-drawn buggy on a part of the street that ran along the top of a 35-foot-wide embankment that was elevated 10 feet above the normal street level and ran for 600 feet down the middle of that street, and his horses spooked and dragged the buggy down the embankment. See *Wilson*, 60 Ga. at 474, 477–78; *City of Atlanta v. Wilson*, 59 Ga. 544, 545 (1877). Wilson's claim was not that the embankment itself should have been designed differently, or not constructed at all, but that the city was negligent in failing to "erect any railing or other means of protection along the embankment, for

the safety of vehicles." *Wilson*, 59 Ga. at 544. In other words, Wilson claimed that the City failed to keep the street safe for ordinary travel in the lane of travel because it failed to erect a barrier that would prevent him from *leaving* the lane of travel, not because it left property *off* the street unsafe for traversal in case of an accident or emergency.

Without any binding precedent that supports that expanded view of the ministerial duty here, the claim in this case cannot be fit within the scope of that duty. It is undisputed that Chang's car left the lane of travel, "slid more than 60 feet," and crashed into the planter where it sat "about six feet off" the road. *Chang*, 373 Ga. App. at 668. There is no evidence in the record that the grassy area where the planter sat, about six feet to the side of the paved road, was on a part of the city street intended for ordinary travel by the public; the City's representative testified that the public had a "right" to use that area (which she described as a "shoulder"), but she then explained only that it could be used by someone driving a vehicle "in the ... event of a[n] emergency or a need to get off the

roadway." Thus, unlike the plaintiffs in any of our decisions addressing claims within the scope of this ministerial duty, Chang neither encountered nor suffered injury from an obstruction while engaging in ordinary travel on a part of the street intended for such travel. See, e.g., *Hampton* 139 Ga. at 390; *Idlett*, 125 Ga. at 824–25; *Bellamy*, 75 Ga. at 168; *Tharpe*, 113 Ga. at 155–56; *Milam*, 95 Ga. at 43; *Hafers*, 61 Ga. at 50; *Cooley*, 55 Ga. at 18; *Perdue*, 53 Ga. at 607–08. Put another way, the ministerial duty of a municipality to keep city streets safe for ordinary travel does not include keeping property outside of the lanes of travel safe for traversal in case of accident or emergency, and so that ministerial duty was not implicated by the plaintiff's claim as it was litigated in this case.

4. *Conclusion*

In light of the above, we must conclude that municipal immunity for the plaintiffs' road-defect negligence claim here is not waived by OCGA § 36-33-1(b). But that is all we decide. We do not decide whether any other potential waiver of that immunity, like OCGA § 36-33-1(a)'s insurance-based waiver, applies. Nor do we

33

decide anything about the elements of the underlying negligence claim, including the scope of the City's duty of care with respect to its right of way. (In other words, our conclusion that the claim does not fall within the scope of this particular ministerial duty says nothing about the City's general duty of care relevant to this claim.) And finally, we do not reach any issues with respect to the nuisance claim in this case (which was a separate basis for the jury's verdict), including whether municipal immunity extends to that claim.

*Judgment vacated and case remanded. All the Justices concur, except Ellington and Colvin, JJ., who dissent, and Peterson, C.J., and Land, J., disqualified.*

COLVIN, Justice, dissenting.

I respectfully dissent from the majority opinion because I believe that OCGA § 36-66-1(b) waived the City of Milton's municipal immunity with respect to Chang's negligence claim.

To begin, I agree with the majority opinion's description of the facts in Division 1 and its explanation of the applicable legal framework as expressed in Divisions 2 and 3(a). I therefore agree that when determining whether OCGA § 36-33-1(b) waived the City's municipal immunity with respect to Chang's negligence claim, the proper inquiry is whether that claim was predicated on the City's "neglect to perform ... [its] ministerial duties." OCGA § 36-33-1(b). See Maj. Op. at 13. And I further agree that, under this Court's precedent, a municipality's duty to keep its streets and sidewalks reasonably safe for ordinary travel is a ministerial one, and that, because the categorization of this duty as ministerial is somewhat incongruous with the principles we generally apply when making such classifications, our determination of the scope of this duty is limited to a review of our precedent. See Maj. Op. at 18–20.

35

But I read some of that precedent differently than the majority opinion, and so I disagree with its analysis in Division 3(b) and the conclusion that follows in Division 4, as explained further below.

1. The majority opinion contends that the scope of a municipality's ministerial duty to keep its streets and sidewalks reasonably safe for ordinary travel is limited to the lanes of travel, see Maj. Op. at 2, 21–24, which "includes keeping people engaging in ordinary travel on the parts of the street or sidewalk intended for such travel safe from adjacent obstructions." Maj. Op. at 28. Certainly, this formulation captures much of our precedent, as the majority opinion correctly identifies, but I believe it fails to square with at least two of our prior cases: *Wilson v. City of Atlanta*, 60 Ga. 473 (1878), and *City Council of Augusta v. Tharpe*, 113 Ga. 152 (1901). Following these cases, I would hold that a municipality's duty to keep its streets and sidewalks safe extends to "all parts of its" municipal street system "which are intended to be used by the public" and "over which the public ha[s] a right to pass." *Tharpe*, 113 Ga. at 156 (quoting *City of Atlanta v. Milam*, 95 Ga. 135, 137 (1894)).

36

In *Wilson* and in a prior decision in the same case, *Atlanta v. Wilson*, 59 Ga. 544 (1877) ("*Wilson I*"), we described how the plaintiff was traveling by horse and buggy along a raised embankment on Harris Street when his horses became frightened and "sprang … suddenly forward," causing his buggy to "pull[ ] to the side" of the embankment and be thrown down it. *Wilson II*, 60 Ga. at 474. See also *Wilson I*, 59 Ga. at 545. As result of this incident, the plaintiff was "seriously" injured. *Wilson II*, 60 Ga. at 474. The *Wilson* Court explained that "Harris street was some fifty or sixty feet wide," and that the "embankment or grade" "along the center of it … [was] about ten feet high and two hundred yards long." Id. This structure was "thirty-five feet wide, thus leaving a part of the street sunk below its level." Id. The plaintiff contended that "the city was negligent in constructing the embankment where plaintiff's horses ran away with the buggy and hurt him, in not providing it with necessary railings or other means of protection, *and in not keeping the street in safe condition*." Id. at 475 (emphasis added).

A jury found for the plaintiff and awarded damages, but the

37

city moved for a new trial on several grounds, and the trial court granted the city's motion on each of the grounds raised. Id. The plaintiff then appealed. Id. On appeal, we held that the trial court was within its discretion to grant a new trial on the ground that the verdict was against the law and the evidence but that it had erred in granting the motion on several other grounds. Id. at 475–76. As relevant here, we held that the trial court erred in ruling that the plaintiff could not recover if the street was graded and drained in accordance with a general plan adopted by the city in exercise of its "law-making power." Id. at 476. This was error, we explained, because there was "no evidence in the record of any such general plan," and because the plaintiff's negligence claim was predicated on an alleged breach of the city's failure to keep the streets "reasonably safe for travel." Id. Accordingly, even "if there had been evidence" of such a plan, it would have "nothing to do with this case." Id. And in reversing the trial court's ruling on other grounds, we further explained that the city's duty to keep its streets reasonably safe included making them safe for "such accidents as might, without

38

fault on the part of the traveler, befall him." Id. at 477.

In describing *Wilson II*, the majority opinion asserts that it was not binding precedent on the scope of the ministerial duty at issue here. Maj. Op. at 29. I disagree. When explaining that any evidence that the embankment was raised in accordance with a general plan made by the city in exercise of its law-making power would be irrelevant, we were distinguishing the plaintiff's negligent *maintenance* claim from the type of negligent *design* claims for which the city would enjoy governmental immunity. See *Wilson II*, 60 Ga. at 476. Put differently, we held that the city could be liable on re-trial because the plaintiff's claim — in which he was injured when he *left* the lane of travel — alleged a breach of the city's ministerial duty to keep the streets reasonably safe.

*Tharpe* also involves a negligence claim for injuries sustained outside the lane of travel. In *Tharpe*, a 12-year-old boy (acting through "his next friend") sued the City of Augusta for negligence, alleging that he was injured when, in crossing between the sidewalk and the street, he struck "a wire ... similar to a barbed wire, which

[the city] had ... allowed to remain stretched along the edge of the sidewalk." *Tharpe*, 113 Ga. at 153. The evidence showed that the wire was "fastened to two telegraph poles four or five feet apart," at "about the height of plaintiff's cheek from the ground" and that it "was stretched along the curbing and parallel to it." Id. at 154. The *Tharpe* Court explained that "[t]here was no regular street-crossing where it was situated," and "[i]n walking along the sidewalk one would not strike this wire unless he attempted to cross the street."[11] Id. The jury awarded damages to the plaintiff; the trial court denied the city's motion for new trial; and it appealed. Id.

On appeal, the City of Augusta argued that it was error for the trial court to instruct the jury that it is

> [t]he duty of the city is to keep a sidewalk reasonably safe for public use. That extends to all of the sidewalk intended for travel by the public as a thoroughfare, and is not confined to keeping in a safe condition a separate part only of the sidewalk which happens to be generally used.

---

[11] Though not relevant to the issues here, modern readers wondering why a barbed wire had been strung along the curb may benefit from the Court's explanation that it had "probably [been] placed there to keep horses from backing on the sidewalk." Id.

Id. at 155. The city argued that this instruction was erroneous because it instructed the jury that the city had a duty "to keep that portion of the sidewalk immediately along the curbing ... reasonably safe for public use," which the city apparently contended it did not. But the Court rejected this argument and upheld the trial court's use of the instruction above. In doing so, it quoted approvingly from *City of Atlanta v. Milam*, 95 Ga. 135 (1894), in which this Court explained that "city authorities must keep in a reasonably safe condition all parts of its sidewalks which are intended to be used by the public" and "over which the public have a right to pass." Id. at 156 (quoting *Milam*, 95 Ga. at 137). In other words, the *Tharpe* Court held that a municipality's duty extends to all parts of the municipal street and sidewalk system on which members of the public have the right to travel, including the area where the plaintiff in *Tharpe* was injured, which was outside of each of the lanes of travel: the site of the plaintiff's injury was in between the lane for pedestrian travel on the sidewalk and the lane for horse and vehicle travel on the street, and it was also some distance removed from the

crosswalk designating the lane of travel for pedestrians crossing the street.

As stated above, the majority opinion contends that a city's ministerial duty to keep its streets and sidewalks reasonably safe for ordinary travel is limited to the areas intended for such travel, which it refers to as the "lanes of travel." Maj. Op. at 2, 21. And the majority opinion contends that *Tharpe* provides an "important qualifier" to this rule, by clarifying that this ministerial duty "includes keeping people engaging in ordinary travel on the parts of the street or sidewalk intended for such travel safe from adjacent obstructions." Maj. Op. at 28. But this "qualifier" does not quite capture *Tharpe's* holding because the wire at issue in *Tharpe* (which the majority opinion considers an adjacent obstruction) did not render the lanes of travel (the street, the sidewalk, or the crosswalk) unsafe for ordinary travel. As *Tharpe* made clear, people "walking along the sidewalk" — that is, people traveling in the lane intended for ordinary pedestrian travel — "would not strike the wire." *Tharpe*, 113 Ga. at 154. The wire posed a danger only to people who left the

lane of travel and "attempted to cross the street" outside the crosswalk designated for that purpose. Id.[12]

Moreover, in attempting to read *Tharpe* in harmony with this Court's other precedents, the majority opinion equates areas in which the public has a right to travel with areas intended for ordinary travel, which are the very areas the majority opinion contends are within the scope of a city's ministerial duty. See Maj. Op. at 28, n.9. But if these two areas are the same, then the majority should accept that the City of Milton's ministerial duty encompassed the site of Chang's collision: it is undisputed by the parties that the planter with which Chang collided was in the shoulder of Batesville Road, and that the shoulder of the road was an area that was intended to be used by the public and in which the public had a right to travel. It is inconsistent for the majority opinion to contend that a city's ministerial duty includes parts of the street in which the

---

[12] The majority opinion argues that the wire was both in the area intended for ordinary travel and an obstruction adjacent to that area. Compare Maj. Op. at 26–27, with Maj. Op. at 27–28. But it cannot be both. Given the *Tharpe* Court's description of the wire's location, I think it is better characterized as outside the relevant lanes of travel.

public has a right to travel while also holding that the City of Milton's ministerial duty did not include the shoulder of Batesville road.[13]

2. As stated above (and as explained in the majority opinion), OCGA § 36-33-1(b) waives municipal immunity for claims involving a municipality's neglect to perform its ministerial duties. See OCGA § 36-33-1(b); Maj. Op. at 11. The City of Milton had a ministerial duty to keep its streets reasonably safe for ordinary travel, and, in my view, our precedent provides that this duty encompassed all portions of the street "over which the public ha[s] a right to pass." *Tharpe*, 113 Ga. at 156. It is undisputed that the

---

[13] The majority opinion contends that there was "no evidence in the record" that the planter, which was on the shoulder of Batesville Road, "was on a part of the city street intended for *ordinary* travel by the public." Maj. Op. at 32 (emphasis added). To make this claim, it discounts statements by the City's own expert that the shoulder could be used "in the ... event of a[n] emergency or a need to get off the roadway." Id. at 32–33. In the majority opinion's view, such travel is not ordinary travel, and so the expert's statement is not evidence that the shoulder could be used for ordinary travel. I see it differently: deposition testimony that the shoulder could be used in an emergency was evidence about the type of travel which is ordinary for the shoulder, rather than evidence that the shoulder was not used for ordinary travel. Just as "'ordinary' travel may look different for sidewalks and streets," Maj. Op. at 26, n.7, so too may ordinary travel look different on various *parts* of the street.

planter at issue in this case was located in the shoulder of Batesville Road, an area in which the public had a right to travel. It follows that Chang's negligence claim implicated Milton's ministerial duties, and so OCGA § 36-33-1(b) waived the City's municipal immunity as to Chang's claim. Because the majority opinion holds the contrary, I respectfully dissent.

I am authorized to state that Justice Ellington joins in this dissent.